**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ANTHONY NABOR OROSCO,<br><br>    Petitioner,<br><br>    v.<br><br>JOSIE GASTELO,<br><br>    Respondent. | No. 2:19-CV-2624-KJM-DMC-P<br><br>FINDINGS AND RECOMMENDATIONS |

        Petitioner, a state prisoner proceeding with retained counsel, brings this petition for a writ of habeas corpus under 28 U.S.C. § 2254.  Pending before the Court are Petitioner's petition for a writ of habeas corpus, ECF No. 1, Respondent's answer, ECF No. 13, and Petitioner's amended traverse, ECF No. 16.  Respondent has lodged the state court record, ECF No. 14.

        Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  The AEDPA does not, however, apply in all circumstances.  Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in state court proceedings

///

1

unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under § 2254(d)(1), federal habeas relief is available only where the state court's decision is "contrary to" or represents an "unreasonable application of" clearly established law. Under both standards, "clearly established law" means those holdings of the United States Supreme Court as of the time of the relevant state court decision. See Carey v. Musladin, 549 U.S. 70, 74 (2006) (citing Williams, 529 U.S. at 412). "What matters are the holdings of the Supreme Court, not the holdings of lower federal courts." Plumlee v. Masto, 512 F.3d 1204 (9th Cir. 2008) (en banc). Supreme Court precedent is not clearly established law, and therefore federal habeas relief is unavailable, unless it "squarely addresses" an issue. See Moses v. Payne, 555 F.3d 742, 753-54 (9th Cir. 2009) (citing Wright v. Van Patten, 552 U.S. 120, 28 S. Ct. 743, 746 (2008)). For federal law to be clearly established, the Supreme Court must provide a "categorical answer" to the question before the state court. See id.; see also Carey, 549 U.S. at 76-77 (holding that a state court's decision that a defendant was not prejudiced by spectators' conduct at trial was not contrary to, or an unreasonable application of, the Supreme Court's test for determining prejudice created by state conduct at trial because the Court had never applied the test to spectators' conduct). Circuit court precedent may not be used to fill open questions in the Supreme Court's holdings. See Carey, 549 U.S. at 74.

///
///
///
///
///
///
///

2

# I. BACKGROUND[1]

### A. **Facts of the Case**

On March 17, 2015, Petitioner shot and killed his girlfriend while they were in their bed. See ECF No. 14-19, pg. 1 (California Court of Appeal's opinion on direct review). Petitioner and the victim had attended high school together and reconnected via social media eight to ten months prior to the killing. Id. at 2. Shortly thereafter, they began a romantic relationship, spending time together at Petitioner's house. Id. Two children also lived with Petitioner part-time; one was a child of the victim. See id.

Petitioner abused prescription painkillers throughout the relationship, which would often make him paranoid and aggressive. See id. at 2-3. This was testified to by the victim's oldest child, as well as documented in numerous text message conversations between Petitioner and the victim. See id. Approximately two weeks prior to the killing, Petitioner purchased a .22-caliber revolver pistol. See id. at 3. After the purchase, Petitioner regularly carried the pistol around the house, paranoid of trespassers. See id. at 4. Petitioner was especially concerned about the victim's ex-boyfriend, and father of the victim's youngest son. See id. He had at least one shouting match with the ex-boyfriend and continued to be paranoid of him throughout the relationship. See id.

The morning of the killing, the victim had a difficult time waking Petitioner. See id. at 5. Concerned about Petitioner's shallow breathing, and aware that he had taken several pills the night before, she called 911. See id. Emergency responders found him in a state typical of opiate abuse and administered treatment to counteract a potential overdose. See id. They transported him to the hospital where his blood was drawn, testing positive for opiates, benzodiazepines, and barbiturates. See id. Petitioner was discharged from the hospital shortly after noon. See id. The victim and Petitioner's mother picked him up to take him back to his

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct." Findings of fact in the last reasoned state court decision are entitled to a presumption of correctness, rebuttable only by clear and convincing evidence. See Runningeagle v. Ryan, 686 F.3d 759 n.1 (9th Cir. 2012). Petitioner bears the burden of rebutting this presumption by clear and convincing evidence. See id. These facts are, therefore, drawn from the state court's opinion(s), lodged in this court. Petitioner may also be referred to as "defendant."

1  house. See id. at 5-6. An argument happened while driving that prompted the victim to leave the
2  car while Petitioner and his mother visited his grandmother's grave. See id. at 6. Petitioner and
3  his mother looked for the victim, getting into another argument, at which point Petitioner left the
4  car and walked home. See id. He then took a muscle relaxant and went to sleep. See id.

5  Petitioner gave contradictory statements about whether he remembered the victim
6  returning home, or any discussion he had with her thereafter. See id. at 8. In one instance he
7  claimed that he did not remember her returning, but in his police interview stated that she came
8  over in the afternoon and had a conversation about why the victim had called him an ambulance
9  that morning. See id. Later that night, Petitioner claims he awoke to the sound of dogs barking.
10 See id. at 7. Concerned that the victim's ex-boyfriend was trespassing, he grabbed his revolver,
11 and started to get up, and while turning to stand, the gun went off. Id. Petitioner then noticed that
12 he had shot the victim. See id. He denied shooting her on purpose or being in an altercation with
13 her prior to or during the shooting. See id.

14 Contrary to this account, based on physical evidence at the scene, the medical
15 examiner found that Petitioner had been on top of the victim, pointing the gun at her face as she
16 leaned away from the firearm. See id. The victim also presented with bruises consistent with a
17 person struggling to escape from under an aggressor. See id. at 7-8. According to Petitioner, he
18 then attempted to drag the victim to the bathroom. See id. at 9. Unable to do so, he ran to a
19 neighbor and asked them to call the police, stating that he thought he had killed his girlfriend.
20 See id. He returned to his house and dragged her to the bathroom and attempted resuscitation.
21 See id. This was corroborated by physical evidence at the scene, including pooling blood near the
22 bed, and blood trails leading to the bathroom from the bedroom. See id. at 9-10. Police arrived
23 and apprehended the Petitioner, who was covered in blood and still holding the firearm. See id. at
24 10.
25 / / /
26 / / /
27 / / /
28 / / /

### B. Trial and Jury Deliberations

The instant petition concerns the trial court's response to three jury questions during deliberations (Question Nos. 1, 6, and 7). See ECF No. 1. After both sides presented their case, the jury "was properly instructed with relevant standard homicide instructions" including the California standardized jury instructions that provide an overview of the difference between lawful homicide, manslaughter, and murder. ECF No. 14-19, pg. 12. They were also given jury instructions more specifically describing lawful homicide, murder, first-degree murder, and involuntary manslaughter. See id. The prosecution argued for first- or second-degree murder based on implied malice by the Petitioner. The defense argued that the prosecution had not shown that Petitioner did not accidentally discharge the gun, which would make his crime lawful homicide or involuntary manslaughter at most. See id.

#### 1. Question No. 1 from the Jury

The first jury question that concerns this petition came on day one of deliberations when the jury asked for a "detailed description of [the] charges which are applied to [defendant's] case." Id. at 12-13. The California Court of Appeal explained the trial court's response:

> The trial court responded: "The instructions have numbers at the top. So the first instruction on homicide is 500. And that discusses the general murder and manslaughter as being types of homicide. [¶] Then 520 discusses murder, and it gives the elements of murder. [¶] 521 says that: The defendant is guilty of first-degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. [¶] And it goes on from there and discusses the rest of first-degree murder. [¶] The last paragraph might answer your question. And that says: The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first-degree murder and the murder is second degree murder. [¶] If you find the defendant is guilty of murder, which is defined in 500 [¶]. . . [¶]. . . and 520." The jury foreperson then said, "Okay. I understand," and repeated: "I understand. I understand." The trial court continued: "Okay? So then, though, if you have a reasonable doubt as to whether it was first degree or second-degree murder, and you find the defendant not guilty of murder, murder first degree or murder second degree, then you look at whether it is -- and this is number 580 -- involuntary manslaughter."
>
> Id. at13-14.

///

1  The foreperson again indicated understanding at which point the trial court re-read CALCRIM

2  Nos. 500, 520, and 521.  See id. at 14.

                2.        Question Nos. 6 and 7 from the Jury

4           The sixth and seventh jury questions came on day two of deliberations.  See id.

5  Question six read: "We the jury request a [description] of the difference between 'intended to kill'

6  and 'intentionally committed an act.'"  Id. at 14.  Jury question seven came immediately after and

7  read: "We the jury request a [description] of the difference between 'a deliberate act with

8  conscious disregard for human life' and 'conscious disregard of the risk to human life.'"  Id.

9           Before responding, the trial court discussed the answers with counsel.  See id. at

10  14-15.  The court explained that it was going to answer the first question by explaining the

11  difference between specific and general intent, specifically "doing an act without any particular

12  intent as to consequence, as opposed to doing an act with a specific intent, desiring a specific

13  consequence."  Id.  Regarding jury question seven, the court told counsel: "that is the difference

14  between a deliberate act of conscious disregard for human life, and conscious disregard to the risk

15  of human life, which is similar.  And I think the – issue is a deliberate act just means . . . a willful

16  act. . . . I think it's pretty much the same thing what they are asking about."  Id. at 15.

17           Defense counsel was concerned with the court's proposed response to jury

18  question number six, specifically with the answer to "what 'intentionally committing an act'

19  meant."  Id.  The trial court explained that it wanted to convey that it meant "volitionally

20  committing an act," avoiding the word "intent" to avoid confusing a voluntary act with specific

21  intent.  Id.  Defense counsel asked "[w]hat are you going to say to the jury?"  Id.  The trial court

22  answered: "I'm going to say volitionally doing an act voluntarily."  Id.

23           The appellate court described the trial court's responses to the jury as follows:

> The jury was then brought into the courtroom and the trial court provided the following answer to Jury Question No. 6: "The . . . first question is: We, the jury, request a description of the difference between intended to kill and intentionally committed an act. [¶] And that is really the difference between specific and general intent.  [¶] The intentionally committed an act could be confusing because there's another -- there are other words that could be used for intentionally committed an act. [¶] For instance, we don't have assault with a deadly weapon in this case. If we did, a person commits an assault with a deadly weapon if they point a gun

at a person, pull the trigger and shoot. [¶] Another charge would be attempted murder. They point a gun at a person and shoot. They miss him. They miss the person both times. One could be attempted murder, though, depending on the intent of the shooter. [¶] If the person intends to kill the person, that's attempted murder. That's a specific intent to kill. And that's a requirement for attempted murder. [¶] Assault with a deadly weapon is a general intent crime. Doing the act. Now, one could say intentionally doing the act. Intend to shoot at the person. But it gets confusing because attempted murder is technically intentionally shooting at a person with the intent to kill the person. [¶] So to make it simpler, we say shoots at a person, or volitionally shoots at a person, or voluntarily shoots at a person. That would be assault with a deadly weapon. Or shoots at a person, does the act. [¶] Attempted murder is does the act with the intent to kill -- specific intent to kill. [¶] So I -- I think that's the -- does that answer the difference between intended to kill and intentionally committed an act? [¶] So intent to kill is classic definition of specific intent. [¶] So murder can be committed in two ways: Express malice, implied malice. That's in 520. Express malice is that the -- the defendant unlawfully intended to kill. [¶] Implied malice is the defendant intentionally committed an act. So we have intent again. The natural and probable consequences of the act were dangerous to human life. At the time he acted, he knew his act was dangerous to human life. And, four, he deliberately acted with conscious disregard for human life. [¶] The difference between implied and express malice is express malice, intent to kill; implied malice, there is not an intent to kill."

Id. at 15-16.

The jury said that they did not understand and, as outlined by the appellate court on direct appeal, the trial court continued as follows:

> After a sidebar discussion, the trial court resumed addressing the jury: "Okay. Now that you're confused again. Let me go over 252. And that's the intent instruction. [¶] The crimes and other allegations charged require proof of the union, or joint operation, of act and wrongful intent. [¶] The following crime and allegation require general criminal intent: Possession of a short-barreled rifle as charged in Count 2, the allegation of use of a firearm in the commission of a felony, the allegation of personal use of a firearm, the allegation of personal discharge of a firearm, and the allegation of intentional discharge of a firearm causing great bodily injury or death. [¶] For you to find a person guilty of this crime or to find the allegations true, that person must not only commit the prohibited act, but must do so with wrongful intent. A person acts with wrongful intent when he intentionally does a prohibited act. However, it is not required that he intend to break the law. The act required is explained in the instruction for that crime or allegation. [¶] The following crime requires a specific intent or mental state: Murder, as charged in Count 1. For you to find a person guilty of this crime, the person must not only intentionally commit the prohibited act, but must do so with a specific intent and/or mental state. The act and the specific intent and/or mental state required are explained in the instruction for that crime. [¶] For instance, 12022.53, intentional discharge of a firearm causing great bodily injury or death, that allegation, that is a general intent allegation. The intent required is just the general intent to fire the gun. But there is no specific intent required for that -- for

7

> that allegation to be found true. And, of course, you can only find that true if the defendant is found guilty of murder. But for that to be true, it is not required that he intended to kill or cause great bodily injury when he fired the gun. [¶] But with murder, express malice requires specific intent, and that is -- and he unlawfully intended to kill. [¶] Implied malice, that means the defendant 17 intentionally committed an act of -- of shooting the gun, knowing that the natural and probable consequences of the act were dangerous to human life. At the time he acted, he knew his act was dangerous to human life. But in spite of knowing this, the defendant deliberately acted with conscious disregard for human life. There is not an intent to kill required if those facts are found true. If those facts are found true. That's a big if. Crucial. Important."

Id. at 17-18.

Two of the jurors requested written responses to Question Nos. 4 and 6, which the trial court provided. See id. at 18. One of the jurors then asked: "Did we have another handwritten question?" Id. The trial court indicated it "answered all" of the questions, adding: "Two of them were pretty much – pretty similar." Id.

### C. Procedural History

After deliberations, the jury returned a verdict of guilty of second-degree murder, and guilty of possession of a short-barreled rifled, along with firearms enhancements not relevant to this Petition. See id. at 2. Petitioner was sentenced to an indeterminate term of 15 years to life consecutive to an aggregate determinate term of 13 years. See id. at 2-3. Petitioner's conviction was affirmed on direct appeal on September 20, 2018, but the matter was remanded for resentencing due to strike the firearm violation. See id. at 2. The California Supreme Court denied direct review without comment or citation on November 28, 2018. See ECF No. 14-21. Petitioner did not file any state post-convictions actions. The instant federal petition was filed on December 27, 2019. See ECF No. 1.

## II. DISCUSSION

In his petition, Petitioner raises two claims. First, Petitioner contends that the trial court's responses to the three questions posed by the jury rendered his trial fundamentally unfair. See ECF No. 1, pg. 26-36. Second, Petitioner claims that his trial counsel was ineffective for failing to object to the court's responses to the jury questions. See id. at 36-39. As to the first

8

claim, Respondent contends that the claim is procedurally barred, the claim is unexhausted as to Question No. 1, and the entire claim was reasonably rejected by the state court.  See ECF No. 13, pgs. 14-22.  As to the second claim, Respondent argues the state court reasonably rejected Petitioner's claim of ineffective assistance of trial counsel with respect to the three jury questions and trial court's responses thereto.  See id. at 22-27.

### A.     Questions from the Jury

Respondent argues Petitioner's claim regarding all three jury questions is procedurally barred.  Respondent also contends that Petitioner's claim regarding Question No. 1 is unexhausted.  The Court agrees.

### 1.     Procedural Bar

The state court determined that Petitioner's claim regarding the trial court's responses to the three questions from the jury was forfeited.  See ECF No. 14-19, pgs. 18-19.  The California Court of Appeal concluded:

> "'When the trial court responds to a question from a deliberating jury with a generally correct and pertinent statement of the law, a party who believes the court's response should be modified or clarified must make a contemporaneous request to that effect; failure to object to the trial court's wording or to request clarification results in forfeiture of the claim on appeal.' [Citations.]" (*People v. Boyce* (2014) 59 Cal.4th 672, 699.) Moreover, when a defendant approves of the trial court's response to a jury question during deliberations, any claim of error with respect to that response is forfeited. (*People v. Bohana* (2000) 84 Cal.App.4th 360, 373; see also *People v. Lazo* (2012) 207 Cal.App.4th 332, 350.)
> Here, the trial court conferred with counsel before responding to each of the jury's questions. The only arguable objection made by defense counsel was with respect to Jury Question No. 6. Defense counsel stated he was "a little concerned" about the trial court's proposed response. However, after the trial court indicated it would tell the jury, "[i]ntentionally committing an act" meant "volitionally doing an act voluntarily," defense counsel offered no objection. Nor were any objections lodged contemporaneously with the trial court's responses to these questions. As we explain in greater detail during our discussion of defendant's ineffective assistance of counsel claim, the trial court's responses were generally correct and pertinent statements of the law. Accordingly, in order to preserve his claim on appeal that they were inadequate and left the jury more confused, defendant was required to object on that basis below and request clarification. He failed to do so and has forfeited the claim.

ECF No. 14-19, pgs. 18-19.

///

9

Based on concerns of comity and federalism, federal courts will not review a habeas petitioner's claims if the state court decision denying relief relies on a state law ground that is independent of federal law and adequate to support the judgment. See Coleman v. Thompson, 501 U.S. 722 (1991); Harris v. Reed, 489 U.S. 255, 260-62 (1989). However, a discretionary state rule is not adequate to bar federal habeas corpus review. See Siripongs v. Calderon, 35 F.3d 1308 (9th Cir. 1994). Generally, the only state law grounds meeting these requirements are state procedural rules. Even if there is an independent and adequate state ground for the decision, the federal court may still consider the claim if the petitioner can demonstrate: (1) cause for the default and actual prejudice resulting from the alleged violation of federal law, or (2) a fundamental miscarriage of justice. See Harris, 489 U.S. at 262 (citing Murray v. Carrier, 477 U.S. 478, 485, 495 (1986)). In cases where the state court denies a claim based on a procedural default but also discusses the merits of the claim, the claim is nonetheless procedurally barred on federal habeas review unless the state court's decision fairly appears to rest primarily upon federal law. See Coleman, 501 U.S. at 737.

A state law is independent if it is not interwoven with federal law. See Michigan v. Long, 463 U.S. 1032, 1040-41 (1983). The independence of a state law is measured at the time the default is imposed by the state court to bar a claim. See Bennett v. Mueller, 322 F.3d 573, 582 (9th Cir. 2003); see also La Crosse v. Kernan, 244 F.3d 702, 204 (9th Cir. 2001); Park v. California, 202 F.3d 1146 (9th Cir. 2000) (assessing whether California's waiver default was independent when the California Supreme Court denied the claim). A state law is adequate if it is clear, well-established, and consistently applied. See Bargas v. Burns, 179 F.3d 1207, 1211 (9th Cir. 1999). The adequacy of a state default is measured at the time of the petitioner's purported default. See Fields v. Calderon, 125 F.3d 757, 760 (9th Cir. 1997). Thus, the respective dates for determining the adequacy and independence may not be the same.

The government bears the ultimate burden of establishing adequacy. See Bennett, 322 F.3d at 581. However, because the petitioner bears the initial burden of putting a procedural bar affirmative defense in issue in the case (by asserting specific factual allegations as to inadequacy, for example), the scope of the state's burden of proof is measured by the specific

assertions put forth by petitioner. See id. at 586. The petitioner's burden is de minimis. See King v. Lamarque, 464 F.3d 963, 967 (9th Cir. 2006); see also See Webb v. Kernan, 2008 WL 564965 (E.D. Cal. 2008).

Under California law, failure to object to a response to a jury question during deliberations at trial bars appeal of that issue. See, e.g., People v. Boyce, 330 P.3d 812, 836 (Cal. 2014) (claim that an answer to jury questions resulted in deprivation of due process barred by failure to object); People v. Bohana, 100 Cal. Rptr. 845, 854 (Cal. Ct. App. 2000) (consent "to the trial court's response to jury questions during deliberations" waived ability to appeal); People v. Loza, 207 Cal. Rptr 3d 355, 369-370 (Cal. Ct. App. 2012) (failure to request modification of jury instructions and consent to response to jury questions waived issues on appeal); People v. Kageler, 108 Cal. Rptr. 235, 340 (Cal. Ct. App. 1973). Cf. People v. Boyette, 58 P.3d 391, 422 (Cal. 2002) (failure to object to non-response to jury question by trial court waived right to appeal issue). The Ninth Circuit has concluded that the contemporaneous objection rule has been consistently applied by the California courts. See Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002). The Ninth Circuit has also concluded that the contemporaneous objection default is adequate and independent. See Rich v. Calderon, 187 F.3d 1064, 1066 (9th Cir. 1999); Vansickel v. White, 166 F.3d 953 (9th Cir. 1997).

Petitioner urges this Court to view Rich as non-dispositive. See ECF No. 16, pgs. 4-5. Petitioner argues that Rich should be viewed only in the context of objections to prosecutorial misconduct at sentencing. See id. at 5. The Court declines Petitioner's invitation. While Petitioner is correct that Rich does not touch on the precise issue of objections to a trial court's response to jury questions, it nonetheless stands for the proposition that California's contemporaneous objection rule is well-established and consistently applied, a rule this Court must follow.

Petitioner contends that because California appellate courts may in some circumstances review issues not presented at trial, that the procedural bar to appeal for failure to object is not regularly followed. See ECF No. 1, 32. As stated earlier, a "discretionary rule can be 'firmly established' and 'regularly followed.'" Beard, at 60-61 (quoting Lee, 534 U.S. at 376).

Additionally, the rule here is that a contemporaneous objection is required to preserve an issue for appeal. That a California court may sometimes look at issues on appeal that were not objected to at trial does not mean that the requirement of contemporaneous objection is not firmly established or regularly followed.

Here, the record clearly demonstrates that Petitioner's counsel did not object to the jury instructions at trial. See ECF No. 14-19, pg. 19. The only possible objection that defense counsel lodged was saying that "he was 'a little concerned' about the trial court's proposed response" to jury question six. Id. However, the trial court further explained the answer that it would give to the jury and defense counsel did not object. Id. Counsel also did not object during the trial court's explanations. See id. Therefore, Petitioner's claims relating to the jury questions were procedurally defaulted in state court and this Court is barred from considering the claims on federal habeas review.

This Court may nonetheless consider these claims if Petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation . . . or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750. Cause "must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478 (1986). "'So long as defendant is represented by counsel whose performance is not constitutionally ineffective . . . we discern no inequity in requiring him to bear the risk of attorney error that results in a procedural default.'" Coleman, 501 U.S. at 752 (quoting Carrier, 477 U.S. at 488). Here, Petitioner's counsel did not object to the trial court's answers to the jury questions which form the basis of this petition. See ECF No. 14-19 at 18. As discussed below, defense counsel's failure to object to the trial court's response to jury questions does not rise to the level of ineffective assistance of counsel. Therefore, Petitioner has not established cause for the default. Absent cause, the Court does not consider whether there was prejudice.

/ / /

/ / /

Because Petitioner has not established cause for the default in state court, his only way to overcome the procedural bar to this Court's review is to show a fundamental miscarriage of justice. "In an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." Carrier, 477 U.S. at 496. This is not so here. As discussed below with regard to Petitioner's ineffective assistance of counsel claims, the potentially confusing answer or non-answer to jury questions six and seven did not "probably result[] in the conviction of one who is actually innocent." Id. There was simply enough evidence for the jury to render the verdict that they ultimately chose, and despite any potential confusion caused by the trial court's answers, the jury received legally correct instruction numerous times. Even in the challenged response to jury question six, the trial court explained that murder was a specific intent crime, and required malice, and that implied-malice murder required a voluntary act, in disregard for a known risk to human life. See ECF No. 14-19, pg. 17. This did not shift any presumption of guilt or give instruction that would allow the jury to find Petitioner guilty without proof of an essential element of the alleged crimes.

The answer to jury question one is even less likely to have resulted in the miscarriage of justice. In addition to there being sufficient reason for the jury to convict Petitioner of implied-malice murder, the jury affirmed its understanding of the trial court's response to their question multiple times. See ECF No. 14-3, 718-722.

The Court finds that federal habeas review of Petitioner's claims relating to questions posed by the jury is barred due to a state court procedural default and that Petitioner has failed to demonstrate cause and prejudice or the fundamental miscarriage of justice. This claim must be denied.

    2.  Exhaustion

Under 28 U.S.C. § 2254(b), the exhaustion of available state remedies is required before claims can be granted by the federal court in a habeas corpus case. See Rose v. Lundy, 455 U.S. 509 (1982); see also Kelly v. Small, 315 F.3d 1063, 1066 (9th Cir. 2003); Hunt v. Pliler, 336 F.3d 839 (9th Cir. 2003). The exhaustion doctrine is based on a policy of federal and state

comity, designed to give state courts the initial opportunity to correct alleged constitutional deprivations. See Picard v. Connor, 404 U.S. 270, 275 (1971); see also Rose, 455 U.S. at 518. "A petitioner may satisfy the exhaustion requirement in two ways: (1) by providing the highest state court with an opportunity to rule on the merits of the claim . . .; or (2) by showing that at the time the petitioner filed the habeas petition in federal court no state remedies are available to the petitioner and the petitioner has not deliberately by-passed the state remedies." Batchelor v. Cupp, 693 F.2d 859, 862 (9th Cir. 1982) (citations omitted). Exhaustion is not a jurisdictional requirement and the court may raise the issue sua sponte. See Simmons v. Blodgett, 110 F.3d 39, 41 (9th Cir. 1997).

Regardless of whether the claim was raised on direct appeal or in a post-conviction proceeding, the exhaustion doctrine requires that each claim be fairly presented to the state's highest court. See Castille v. Peoples, 489 U.S. 346 (1989). Although the exhaustion doctrine requires only the presentation of each federal claim to the highest state court, the claims must be presented in a posture that is acceptable under state procedural rules. See Sweet v. Cupp, 640 F.2d 233 (9th Cir. 1981). Thus, an appeal or petition for post-conviction relief that is denied by the state courts on procedural grounds, where other state remedies are still available, does not exhaust the petitioner's state remedies. See Pitchess v. Davis, 421 U.S. 482, 488 (1979); Sweet, 640 F.2d at 237-89.[2]

Here, as Respondent contends, Petitioner failed to present his claim regarding the trial court's response to Question No. 1 to the California Supreme Court. Petitioner's petition for review to the California Supreme Court, which is lodged at ECF No. 14-20, clearly shows that Petitioner only raised arguments as to Question Nos. 6 and 7. Any current claim regarding Question No. 1 is unexhausted and should be denied.

///

///

---

[2] This situation of procedural deficiency is distinguishable from a case presented to the state court using proper procedures but where relief on the merits is precluded for some procedural reason, such as untimeliness or failure to raise the claim on direct appeal. The former represents an exhaustion problem; the latter represents a procedural default problem.

### B. <u>Ineffective Assistance of Counsel</u>

The Sixth Amendment guarantees the effective assistance of counsel. The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. <u>See id.</u> at 688. To this end, petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. <u>See id.</u> at 690. The federal court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance. <u>See id.</u> In making this determination, however, there is a strong presumption "that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made." <u>Hughes v. Borg</u>, 898 F.2d 695, 702 (9th Cir. 1990) (citing <u>Strickland</u>, 466 U.S. at 689).

Second, a petitioner must affirmatively prove prejudice. <u>See Strickland</u>, 466 U.S. at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." <u>Id.</u>; <u>see also</u> <u>Laboa v. Calderon</u>, 224 F.3d 972, 981 (9th Cir. 2000). A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." <u>Pizzuto v. Arave</u>, 280 F.3d 949, 955 (9th Cir. 2002) (quoting <u>Strickland</u>, 466 U.S. at 697).

In rejecting Petitioner's ineffective assistance of counsel claim on direct appeal, the California Court of Appeal applied the <u>Strickland</u> standard and held:

> Anticipating forfeiture, defendant asserts his trial counsel rendered constitutionally deficient assistance by failing to so object and request clarification. We disagree.
>
> * * *

We begin with the first element of this claim, deficient performance. "Generally, failure to object is a matter of trial tactics as to which we will not exercise judicial hindsight. [Citation.] 'When a defendant makes an ineffectiveness claim on appeal, the appellate court must look to see if the record contains any explanation for the challenged aspects of representation. If the record sheds no light on why counsel acted or failed to act in the manner challenged, "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation" [citation], the contention must be rejected.' [Citation.] A reviewing court will not second-guess trial counsel's reasonable tactical decisions. [Citation.]" (*People v. Kelly* (1992) 1 Cal.4th 495, 520.)

Here, defense counsel was not asked for an explanation as to why he did not object to the trial court's responses or request clarification. However, the record suggests a reasonable explanation. First, contrary to defendant's argument on appeal, the trial court's answer to Jury Question No. 1 was an entirely accurate and appropriate response to the jury's request. As previously set forth in detail, the jury wanted a breakdown of the various homicide offenses and was confused by the fact the jury instructions did not "go into second degree murder." The trial court responded by going over the homicide instructions. While doing so, it became clear the jury did not initially understand that if they found defendant guilty of murder, defined in CALCRIM No. 520, but not guilty of first-degree murder, defined in CALCRIM No. 521, then the crime was second degree murder. When the trial court got to the sentence of the latter instruction spelling that out, the foreperson said: "Okay. I understand," and repeated: "I understand. I understand." Despite having apparently cleared up the confusion, the trial court continued by pointing out that if the jury found defendant not guilty of murder, they must determine whether or not he was guilty of involuntary manslaughter, defined in CALCRIM No. 580, to which the foreperson said: "Gotcha. I understand you." Then, at the jury's request, the trial court re-read the murder instructions. The trial court also offered to re-read the involuntary manslaughter instruction, but the foreperson declined, stating: "No, we pretty much understand now." As our Supreme Court has explained: "Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.) Because the trial court's response was sufficient in this regard, as confirmed by the foreperson, there was no reason for defense counsel to have objected.

With respect to the trial court's combined response to Jury Question Nos. 6 and 7, we acknowledge the jury appeared to have been confused by the trial court's foray into the crimes of attempted murder and assault with a deadly weapon, crimes not charged in this case. We also acknowledge the two jury questions did not ask "pretty much" the same thing, and warranted separate responses. However, after the trial court's initial attempt at differentiating between "intended to kill" and "intentionally committed an act," during which the court explained, "intentionally doing the act" means "volitionally" or "voluntarily" doing that act, the court went over CALCRIM No. 252 and set forth in detail the mental states required for each crime and enhancement. In doing so, the court again set forth the mental state required for murder, distinguishing between express malice (i.e., "unlawfully intended to kill") and implied malice (i.e., "intentionally committed an act") the natural and

16

probable consequences of which were dangerous to human life with knowledge of and conscious disregard for the danger. This answered the jury's question in a legally correct manner. If defense counsel wanted further clarification, it was incumbent upon him to request it. Moreover, his failure to do so may well have been a tactical decision based on a conclusion that if the jury was confused about whether implied malice also required an intent to kill, such confusion would inure to defendant's benefit rather than his detriment. Again, we must reject defendant's ineffectiveness claim unless there is no possible satisfactory explanation. (*People v. Kelly, supra*, 1 Cal.4th at p. 520.)

The same calculus may have motivated defense counsel to refrain from objecting that the trial court's answer did not directly address Jury Question No. 7. That question asked for a description of "the difference between 'a deliberate act with conscious disregard for human life' and 'conscious disregard of the risk to human life'." Both phrases described implied malice and the immaterial difference in wording comes from CALCRIM Nos. 520 and 580, respectively. The trial court could have explained as much, but then the court may well have felt obliged to again define implied malice for the jury, at the risk of clearing up any potential lingering confusion regarding whether or not that mental state also required an intent to kill.

In any event, even if we were to conclude defense counsel's failure to object or request clarification fell below an objective standard of reasonableness, defendant has failed to carry his burden of demonstrating prejudice. First, the trial court correctly defined murder, including express and implied malice, multiple times. The jury also received written versions of the instructions. Second, viewing the jury's ultimate verdicts together with their jury questions reveals they likely concluded defendant did not intentionally shoot the victim and similarly did not intend to kill her. The jury questions indicate debate in the jury room regarding whether or not defendant's conduct immediately before he fired the gun satisfied the requirements of implied malice murder. Strong evidence supported such a conclusion. By defendant's own admission, he was lying in bed next to the victim while holding a loaded and cocked revolver. He dramatically described the danger that weapon posed in multiple text messages to the victim. For present purposes, one example will suffice: "Its considered more deadly than a 9mm cuz a 9 go[es] in and rite trew the body but a 22 goes in and ri[cochets] off bones causin[g] more internal damage." Defendant was also addicted to prescription medication and knew the combined danger his pill use and possession of the gun posed. Again, he revealed as much in text messages to the victim: "Did u know my mom told me that my son was worryed I was gonna die or go to prison cuz I have a gun now? . . . Thay worried Ima overdose or kill somebody in my house or yard that's fucking with me and I think thir not too far off." However, as already explained in detail, defendant's account of the shooting was contradicted by the testimony from the medical examiner and forensic evidence at the crime scene that he was on top of the victim and engaged in a struggle with her when the fatal shot was fired. In addition, defendant's admission he was "a little irritated" the victim called 911 earlier that morning supports this scenario. Thus, even if the jury concluded defendant did not intentionally pull the trigger, the evidence supports the conclusion that by struggling with the victim on his bed while holding a loaded and cocked revolver, defendant intentionally engaged in actions the natural and probable consequences of which were dangerous to human life with knowledge of and conscious disregard for the danger.

17

> Simply put, there is no reasonable probability the result of the proceeding would have been different had counsel objected and sought clarification with respect to the trial court's response to Jury Question Nos. 6 and 7.

ECF No. 14-19, pgs. 19-24.

Because the state court applied the Strickland standard, this Court reviews to determine whether it did so unreasonably in rejecting Petitioner's claim of ineffective assistance of counsel. This Court finds that it did not. Regarding counsel's performance, the appellate court reasonably concluded that the trial court gave legally correct answers and that counsel's failure to object could have been either in recognition of that or because counsel believed any confusion would inure to Petitioner's benefit. Regarding the trial court's non-answer to jury question seven, while the appellate court recognized that the question deserved an answer, it reasonably concluded that Petitioner's counsel could have had the same or similar reasons for not objecting. As to prejudice, the state appellate court considered the significant evidence of guilt, including texts from Petitioner about how he might kill someone, texts describing the lethality of the pistol, and evidence from the medical examiner indicating that Petitioner was on top of the victim engaged in a struggle with her during the shooting. This Court finds that the state court reasonably concluded that the weight of the evidence allowed the jury to conclude that Petitioner was guilty of implied-malice murder rather than manslaughter or lawful homicide, notwithstanding any problems with the trial court's answer to the jury questions.

This is not an unreasonable application of federal law. A reasonable jurist could conclude from (1) the written jury instructions, (2) the evidence showing that Petitioner was aggressive towards the victim, and (3) the multiple explanations of the different types of homicide by the trial court, that there was no prejudice from counsel's failure to object to the trial court's answers to jury questions six and seven.

Because the state court's denial of Petitioner's ineffective assistance of counsel claim was not based on an unreasonable application of Strickland, Petitioner's federal claim should be denied.

///

### III.  CONCLUSION

Based on the foregoing, the undersigned recommends that Petitioner's petition for a writ of habeas corpus, ECF No. 1, be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court.  Responses to objections shall be filed within 14 days after service of objections.  Failure to file objections within the specified time may waive the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  July 7, 2022

_____
DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE